Case 4:18-cv-02677 Document 20 Filed on 02/01/19 in TXSD Page 1 of 11

United States District Court
Southern District of Texas

**ENTERED**
February 01, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LLOYD'S OF LONDON SYNDICATE 2987, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-18-2677 |
| BISON DRILLING AND FIELD SERVICES, LLC, | § § § § | |
| Defendant. | § | |

**MEMORANDUM, RECOMMENDATION, AND ORDER**

Pending before the court[1] are Bison Drilling and Field Services, LLC's ("Bison") Motion to Realign the Parties (Doc. 9) and Lloyd's of London Syndicate 2987's ("LLS") Motion to Dismiss (Doc. 10). The court has considered the motions, the responses, all other relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that LLS's motion be **DENIED** and **ORDERS** that Bison's motion is **GRANTED.**

**I. Case Background**

LLS filed this lawsuit seeking a declaratory judgment that it is not required to reimburse Bison for losses associated with a well blowout.

**A. Factual Background**

Bison makes the following factual allegations in its

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 14, Ord. Dated Oct. 2, 2018.

counterclaim:

### 1. Bison's Relationship with PDS

Bison was engaged by PDS Drilling, LLC ("PDS"), to perform drilling operations on the Garnet State #4 Well (the "Well") pursuant to a contract executed by both entities (the "Contract").[2] Section 13.2 of the Contract provides that:

> [PDS] shall at [PDS]'s expense maintain, with an insurance company or companies authorized to do business in the state where the services are to be performed or through a self-insurance program, insurance coverages of the kind and in the amounts set forth in Exhibit "A", insuring the risks, liabilities and indemnity obligations specifically assumed by [PDS] herein, including, but not limited to, Paragraph 14 of this Contract . . . . For the risks, liabilities and indemnity obligations assumed hereunder by [PDS], its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against [Bison]. [PDS] shall cause its underwriters to name [Bison] as additional insureds but only to the extent of the risks, liabilities and indemnification obligations assumed by [PDS] herein.[3]

Section 14.7 of the contract states that "[i]n the event the hole should be lost or damaged, [PDS] shall be solely responsible for such damage to or loss of the hole, including the casing therein."[4] Section 32.11 provides that PDS will "waive, release, protect, defend, indemnify, and hold harmless" Bison from any claims brought by PDS in connection with a wild well.[5] Exhibit A of the Contract

---

[2] See Doc. 7., Bison's Ans. & Countercls. p. 9.

[3] See Doc. 7-1, Ex. 1 to Bison's Ans. & Countercls., The Contract p. 6.

[4] See id. pp. 6-7.

[5] See id. p. 11.

specifies that one of the types of insurance PDS was to carry was "Commercial (or Comprehensive) General Liability Insurance, including the contractual obligations under this Contract and proper coverage for all other obligations assumed in this Contract."[6]

### 2. PDS's Insurance Policy with LLS

PDS obtained "Control of Well" insurance from LLS (the "Policy") with a policy period of October 19, 2016, to October 19, 2017.[7] The Policy states that "[i]t is agreed to automatically include under this Insurance the interest of Additional Insureds, Mortgagees and Loss Payees and to provide waivers of Subrogation as required by written contract."[8] PDS provided Bison with a certificate of liability insurance (the "Certificate") that expressly lists Bison as an additional insured under the Policy.[9]

The Policy provides that LLS:

> agree[s], subject to the Combined Single Limit of Liability, terms and conditions of this policy, to reimburse the Asssured for actual costs and/or expenses incurred by the Assured (a) in regaining or attempting to regain control of any and all well(s) insured hereunder which get(s) out of control including any other well that gets out of control as a direct result of a well insured hereunder getting out of control, but only such costs and/or expenses incurred until the well(s) is (are)

---

[6] See id. p. 13.

[7] See Doc. 7-2, Ex. 2 to Bison's Ans. & Countercls., The Policy p. 2.

[8] See id. p. 5.

[9] See Doc. 7-3, Ex. 3 to Bison's Ans. & Countercls., Certificate of Liability Insurance.

    brought under control as defined in Paragraph 2b of this Section A . . . .[10]

Section A provides that:

    Expenses recoverable hereunder shall include costs of materials and supplies required, the services of individual or firms specialising [sic] in controlling wells, and directional drilling and similar operations necessary to bring the well(s) under control, including costs and expenses incurred at the direction of regulatory authorities to bring the well(s) under control, and other expenses included within Clause 1 of this Section A.[11]

Additionally, Section B of the policy provides that:

    LLS agree[s], subject to the Combined Single Limit of Liability, terms and conditions of this policy, to reimburse the Assured for actual costs and/or expenses reasonably incurred to restore or redrill a well insured hereunder, or any part thereof, which has bee lost or otherwise damaged as a result of an occurrence giving rise to a claim which would be recoverable under Section A of this policy if the Assured's Retention applicable to Section A were nil . . . .[12]

Bison claims that it is covered by the Policy and these contractual provisions provide coverage for the following incident.

### 3. The Well Blowout

"On or about October 25, 2016, the Well went out of control as a result of the wellbore penetrating a pressurized fresh water formation known as the Capitan Reef formation."[13] "[W]ater suddenly began to enter the wellbore, flowing up to the surface out of

---

    [10]    See Doc. 7-2, Ex. 2 to Bison's Ans. & Countercls., The Policy p. 29.

    [11]    See id. p. 30.

    [12]    See id. p. 31.

    [13]    See Doc. 7., Bison's Ans. & Countercls. p. 10.

control and onto the land."[14] Water continued to flow out of control until November 14, 2016, when Bison was able to regain control of the Well.[15] After the water flow had stopped, Bison spent considerable resources attempting to restore the damaged well.[16] Eventually, in early 2017 it was determined that restoring the Well was impractical due to the extent of the damage from the blowout.[17] Bison incurred $922,102.61 in costs and expenses in connection with its efforts to regain control of and restore the Well.[18]

LLS paid PDS $1.4 million in response to PDS's claim for coverage under the Policy.[19] Bison also made a claim for coverage under the Policy.[20] In response, LLS filed this lawsuit arguing that Bison is not entitled to coverage under the Policy.[21]

**B. <u>Procedural Background</u>**

LLS filed its complaint for a declaratory judgment on August 3, 2018.[22] Bison answered and asserted counterclaims against LLS

---

[14] See <u>id.</u>

[15] See <u>id.</u>

[16] See <u>id.</u>

[17] See <u>id.</u> p. 11.

[18] See <u>id.</u>

[19] See <u>id.</u> p. 12.

[20] See <u>id.</u>

[21] See <u>id.</u>

[22] See Doc. 1, LLS's Compl. for Declaratory J.

on August 29, 2018.[23] Bison filed its motion to realign the parties on August 30, 2018.[24] LLS filed its motion to dismiss Bison's counterclaims on September 19, 2018.[25] On September 20, 2018, LLS filed a response to Bison's motion to realign the parties.[26] On September 28, 2018, Bison filed a reply in support of its motion to realign the parties.[27] On October 10, 2018, Bison filed a response to LLS's motion to dismiss.[28] LLS filed a reply in support of its motion to realign the parties on October 23, 2018.[29] Bison filed a sur-reply to LLS's motion to dismiss on November 6, 2018.[30]

## II. Legal Standards

### A. Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) allows dismissal of an action whenever the complaint, on its face, fails to state a claim upon which relief can be granted. When considering a motion to dismiss, the court should construe the allegations in the complaint favorably to the pleader and accept as true all well-pleaded facts. Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 803 n.44 (5th Cir.

---

[23] See Doc. 7, Bison's Ans. & Countercls.

[24] See Doc. 9, Bison's Mot. to Realign the Parties.

[25] See Doc. 10, LLS's Mot. to Dismiss.

[26] See Doc. 12, LLS's Resp. to Mot. to Realign the Parties.

[27] See Doc. 13, Bison's Reply to Mot. to Realign the Parties.

[28] See Doc. 15, Bison's Resp. to Mot. to Dismiss.

[29] See Doc. 17, LLS's Reply to Mot. to Dismiss.

[30] See Doc. 19, Bison's Sur-Reply to Mot. to Dismiss.

2011)(quoting True v. Robles, 571 F.3d 412, 417 (5th Cir. 2009)). The court may also consider, in addition to the complaint itself, "any documents attached to the complaint[] and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010).

A complaint need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555. In other words, the factual allegations must allow for an inference of "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

**B.   Motion to Realign the Parties**

The district court typically has the authority to control the order of proof. Helling v. McKinney, 509 U.S. 25, 35 (1993). "Normally the party with the burden of proof has the right to open and close the argument to the jury." Martin v. Chesebrough-Pond's,

Inc., 614 F.2d 498, 501 (5th Cir. 1980). "Alignment of the parties lies in the sound discretion of the court . . . ." Lloyd v. Pendleton Land & Expl., Inc., 22 F.3d 623, 625 (5th Cir. 1994).

### III. Analysis

**A.  Motion to Realign the Parties**

LLS filed this lawsuit seeking a declaration that Bison is not covered by the Policy and LLS had no duty to indemnify Bison.[31] Bison's counterclaims consist of causes of action for: (1) breach of contract concerning the Policy; (2) breach of the duty of good faith and fair dealing regarding Bison's request for coverage under the Policy; and (3) Texas Insurance Code violations concerning Bison's alleged coverage under the Policy.[32] At this point, LLS essentially seeks a declaration that Bison loses on all of its counterclaims. Bison will have the burden of proof on its counterclaims at trial. Accordingly, for convenience and to avoid confusion, the court believes realigning the parties is proper. Bison's motion to realign the parties is **GRANTED**. Bison is hereby designated as Plaintiff and LLS is hereby designated as Defendant.

---

[31]  See Doc. 1, LLS's Compl. for a Declaratory J. p. 11.

[32]  See Doc. 7, Bison's Ans. and Countercls. pp. 13-17.

**B.    Motion to Dismiss**[33]

LLS argues that Bison does not qualify for coverage under the Policy and, therefore, Bison's claims should be dismissed.[34] Specifically, LLS contends that Bison is not covered by the Policy because Exhibit A of the Contract does not specify that PDS was required to carry well control coverage for Bison.[35]

The Contract specifies that: (1) PDS was required to maintain insurance as specified in Exhibit A; (2) PDS's insurance was to name Bison as an additional insured; and (3) PDS was responsible if the hole was lost or damaged.[36] Exhibit A of the Contract requires PDS to maintain "Commercial (or Comprehensive) General Liability Insurance, including the contractual obligations under this Contract and proper coverage for all other obligations assumed in this Contract."[37] This phrase can be interpreted to mean that PDS was required to maintain "proper coverage for all other obligations assumed in" the Contract in addition to Commercial General Liability insurance. Finally, the Policy provides that it

---

[33]    The Contract, the Policy, and the Certificate are central to Bison's counterclaims and attached to Bison's Answer and Counterclaims. LLS objects to the Certificate being considered. The court finds it unnecessary to consider the Certificate in ruling on LLS's motion to dismiss. Accordingly, the court will consider only the Contract, the Policy, and Bison's allegations in ruling on LLS's motion to dismiss.

[34]    See Doc. 10, LLS's Mot. to Dismiss. pp. 8-11.

[35]    See id.

[36]    See Doc. 7-1, Ex. 1 to Bison's Ans. & Countercls., The Contract p. 6.

[37]    See id. p. 13.

9

automatically includes any additional insureds as required by written contract.[38]

The Contract is a written contract that can be interpreted such that it requires PDS to maintain insurance against loss of or damage to the Well and to name Bison as an additional insured on the insurance. For these reasons, Bison has met its burden at this stage to show that it is an additional insured under the Policy.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that LLS's motion to dismiss be **DENIED**. It is **ORDERED** that the Bison is hereby designated as Plaintiff and LLS is hereby designated as Defendant.

The Clerk shall send copies of this Memorandum, Recommendation, and Order to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers

---

[38] See Doc. 7-2, Ex. 2 to Bison's Ans. & Countercls., The Contract p. 6.

of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 1st day of February, 2019.

_____
U.S. MAGISTRATE JUDGE